# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**AMANDA KAY KUBISIAK**,

      Plaintiff,

v.                              Case No. 8:22-cv-02356-WFJ-SPF

**BOB GUALTIERI** and
**NATHAN MOWATT**,

      Defendants.

_____/

## ORDER

Before the Court is Sheriff Bob Gualtieri and Deputy Nathan Mowatt's ("Defendants") Motion for Summary Judgment (Dkt. 38), Amanda Kay Kubisiak's ("Plaintiff") Response in Opposition (Dkt. 48), and Defendants' Reply (Dkt. 51). This Order also addresses Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim (Dkt. 39) and Defendants' Response in Opposition (Dkt. 47).[1] By invitation of the Court, both parties filed supplemental briefings on the issues raised in Defendants' counterclaim (Dkts. 25, 26) and following oral argument (Dkts. 53, 54). After careful consideration, the Court denies Defendants' Motion and grants Plaintiff's Motion.

---

[1] Defendants' Response refers to the parties as "Counter-Plaintiffs" and "Counter-Defendant." Dkt. 47 at 1. For simplicity, the Court will refer to Ms. Kubisiak as "Plaintiff" and Sheriff Gualtieri and Deputy Mowatt as "Defendants" throughout this Order.

## BACKGROUND

In September 2018, Plaintiff Amanda Kubisiak was arrested and spent eight hours in jail for driving under the influence (a "DUI"). Her breath-alcohol-content ("BAC") was 0.00%, her urinalysis results were negative, and she appears unimpaired in video footage of her Field Sobriety Tests ("FSTs"). The instant case ensued.

### I.     Factual Background

The parties do not contest the events leading to Deputy Mowatt's roadside DUI investigation of Plaintiff. They also agree on what transpired after Plaintiff was arrested and taken to the Pinellas County Central Breath Testing (CBT) facility. However, their versions of the roadside investigation differ. The Court will recount the uncontested facts before detailing Deputy Mowatt's perspective on the roadside investigation, which led to his arresting Plaintiff. It will then tell Plaintiff's version. Finally, it will discuss video footage of the encounter. Because the video does not contradict Plaintiff's version of the facts, the Court accepts her version as true for the purposes of Defendants' Motion. When discussing Plaintiff's Motion, the Court accepts Defendants' relevant facts as true.

A. Uncontested Facts

Plaintiff spent the evening prior to her arrest at her birthday party. Dkt. 38-3 at 11. She arrived at the party, which was held at a friend's house in Largo, around

5:30 P.M. on September 22, 2018. *Id.* at 9–11. She brought food and three twelve-ounce ciders, each approximately 4.5–5% alcohol-by-volume. *Id.* at 11–12. Throughout the evening, she drank water and ate meatballs, bread, chips, and cake. *Id.* at 12–13. She also consumed several ciders—she initially told Deputy Mowatt that she drank three, but later stated she poured most of the third one out. Coban Video (Sep. 23, 2018) (on file with Court Clerk) [hereinafter, "Coban"] at 12:40:05; 12:59:25–01:00:20. Plaintiff ate and drank throughout the evening, with the last cider consumed as late as 11:00 P.M. Dkt. 38-3 at 12; Coban at 12:59:25–:40. She began driving home around midnight. Dkt. 38-3 at 15.

While driving, Plaintiff received a phone call from her sister, Mindy Hurt. *Id.* at 16–17. Ms. Hurt's companion had just been arrested for a DUI, and she called Plaintiff to come and move their vehicle from the side of the road to a nearby parking lot. *Id.* at 17–19. Plaintiff arrived at the scene of the DUI arrest around 12:30 A.M. on September 23, 2018. Dkt. 38-7. She encountered Deputy Mowatt, who administered a series of Field Sobriety Tests (FSTs), concluded that Plaintiff had driven while impaired, and arrested her. *Id.*

Deputy Mowatt transported Plaintiff to the Pinellas County Central Breath Testing (CBT) facility, where he administered two breath tests. Dkt. 38-2 at 18; Dkt. 38-3 at 33. Both tests showed Plaintiff's BAC to be 0.00%. Dkt. 38-2 at 18. Next, Deputy Mowatt administered a urine test to check for other substances. *Id.* at

3

18–19. The results of that test were not immediately available, so he walked Plaintiff over to the Pinellas County jail (attached to the CBT facility) and turned her over to booking. 38-3 at 34. Plaintiff had her mugshot taken, handed over her personal effects, donned jail clothes, and spent approximately eight hours in custody before she was released on her own recognizance. *Id.* at 34–35. She received the results of her urine test about a month later, and they were negative. Dkt. 38-11 at 1. The assistant state attorney who was assigned Plaintiff's DUI prosecution entered a nolle prosequi, and Plaintiff subsequently filed the instant Complaint. Dkt. 1-1 ¶ 26.

While the parties agree on the above details, their facts conflict when it comes to Deputy Mowatt's roadside DUI investigation. They agree that Plaintiff drove up and parked safely, exited her vehicle, and encountered Deputy Mowatt. Dkt. 38-2 at 8. But after that, their stories diverge. The Court will recount these differing versions of the facts now.

B. Deputy Mowatt's Version of the Roadside DUI Investigation

Deputy Mowatt used the Pinellas County Standardized Field Sobriety Test Form ("FST Form") during his investigation. Dkt. 38-10. The front of the FST Form has checkboxes for the administering officer to mark observations about the subject's appearance, health, and performance on the FSTs, as well as information about the conditions of the test site. *Id.* at 1. Additionally, it has a fill-in-the-blank

section for a post-*Miranda* interview, with prompts and spaces to write in the subject's answers. *Id.* The FST portion of the form allows the officer to mark "decision clues" based on the subject's performance. *Id.* For example, a decision clue on the one leg stand test is "sways while balancing." *Id.* The back of the FST Form contains instructions for each test for the officer to read aloud. *Id.* at 2. The back also cautions officers to use discretion when administering the walk and turn and one leg stand tests for subjects who are overweight or have a physical condition that may impact balance. *Id.*

Deputy Mowatt alleges that, when he greeted Plaintiff, her eyes were bloodshot and glassy, her breath smelled slightly of alcohol, and she was swaying. Dkt. 38-8 at 2; Dkt. 38-10 at 1. As a result, he performed a Horizonal Gaze Nystagmus (HGN) test. Dkt. 38-8 at 2. After seeing what he believed to be signs of impairment on the HGN, Deputy Mowatt turned on his Coban in-car camera and conducted a second HGN. Dkt. 38-2 at 12. Deputy Mowatt believed Plaintiff appeared impaired during the second HGN as well, and he also felt that she swayed during the test administration. Dkt. 38-10 at 1. He asked Plaintiff if she'd been drinking, and she said yes. Dkt. 38-2 at 12.

Deputy Mowatt then gave Plaintiff the opportunity to perform several FSTs, and she accepted. *Id.* Before each test, he gave verbal and demonstrative instructions, which Plaintiff said she understood. *Id.* at 17, 24. He began by asking

about Plaintiff's medical history. *Id.* at 12:49:05–12:51:05. Plaintiff indicated that she had recently had knee surgery, but that she could walk in a straight line. *Id.* at 12:49:10–12:50:40.

The first FST Deputy Mowatt conducted was a walk and turn test. Dkt. 38-8 ¶ 14. During the instructions, Plaintiff's knee pain rendered her unable to keep her feet in the position she'd been told to maintain. *Id.* Deputy Mowatt recorded this as a loss of balance on the FST Form. Dkt. 38-10 at 1; Dkt. 38-2 at 23. He also annotated several other errors on the form, writing that: (1) during the first half of the test, Plaintiff lost her balance, stepped off the line, and used her arms for balance; (2) Plaintiff executed the turn incorrectly; and (3) Plaintiff stepped off the line four times during the second half. Dkt. 38-10 at 1.

As the roadside investigation continued, Deputy Mowatt marked several decision clues for the one leg stand and finger to nose tests. Dkt. 38-10 at 1. While Plaintiff was able to stand on one leg throughout the one leg stand test, Deputy Mowatt believed that she was swaying. Dkt. 38-2 at 14. And during the finger to nose test, Plaintiff twice failed to bring her arm back down to her side in a timely manner. Dkt 38-8 ¶ 16. Deputy Mowatt also annotated that she missed her nose five times. *Id.*; Dkt. 38-10 at 1.

Deputy Mowatt read Plaintiff her *Miranda* rights, after which she admitted to having several alcoholic drinks throughout the evening. Dkt. 38-8 ¶ 17. She

denied being impaired but rated herself a two on a "scale of one to ten, with one being stone-cold sober and ten being the most impaired she had ever been." *Id.* ¶ 18. Deputy Mowatt arrested Plaintiff and transported her to the CBT facility. *Id.* ¶ 19; Dkt. 38-3 at 33.

C. Plaintiff's Version of the Roadside DUI Investigation

Plaintiff denies appearing impaired when she was greeted by Deputy Mowatt. At deposition, she testified that her breath did not smell of alcohol, which she knows because of the amount of food and water she consumed after her last drink. Dkt. 38-3 at 25. She admitted that she did not know if her eyes were bloodshot and glassy, but states that she told Deputy Mowatt she'd been wearing contacts for the past fifteen hours. *Id.*

Plaintiff asserts that she "did fine" on the walk and turn. *Id.* at 27. At her deposition, she attributed her apparent errors during the first half of the test to stepping on the back of her sandal. *Id.* at 30–31. She denies using her arms for balance but admits to performing the turn incorrectly. *Id.* Similarly, Plaintiff stated that she performed adequately on the one leg stand test. *Id.* at 27. And while she admits that she left her finger on her nose for a long time during the finger to nose test, she maintains that she touched her nose each time. *Id.* at 26, 32. Plaintiff

argues that her knee injury, as well as being overweight,[2] impacted her ability to perform the FSTs. *Id.* at 30.

### D. In-Car Coban Video Footage of Roadside DUI Investigation

Far from contradicting Plaintiff's version of events, the Coban footage appears to discredit many of Deputy Mowatt's recorded observations. The footage begins halfway through the first HGN test. Coban at 12:35:52–12:36:09. Plaintiff can be seen standing with her arms at her sides as Deputy Mowatt moves a pen light in front of her eyes. *Id.* She appears composed and unflushed. *Id.* Although the video does not show the bottom half of her body during the HGNs, Deputy Mowatt related at deposition that her feet were together, and arms were kept straight at her sides. Dkt. 38-2 at 11. The video shows her moving very slightly forward and backward during each HGN test. Coban at 12:35:52–12:36:09; 12:38:20–12:40:05. After the first HGN test, she walks to the side of the road and assumes a more natural stance for several minutes. *Id.* at 12:36:12–12:38:21. She does not sway or otherwise appear unbalanced. *Id.*

Prior to the walk and turn test, Plaintiff tells Deputy Mowatt that her knee is "rickety" but she "should be okay." *Id.* at 12:49:10–12:50:40. Deputy Mowatt tells her to put her right foot in front of her left and maintain that position during the

---

[2] In the arrest affidavit, Deput Mowatt recorded Plaintiff's weight as 160 pounds. Dkt. 38-7. This alleged weight is clearly refuted by the Coban footage, which plainly shows that Plaintiff weighed more.

walk and turn instructions. *Id.* at 12:51:23–12:52:05. Plaintiff does so, but states, "that hurts my knee" and moves her leg back. *Id.* She does not appear to have lost her balance. *Id.*

Deputy Mowatt can be seen and heard giving the walk and turn instructions. *Id.* at 12:52:05–12:52:47. He does not tell Plaintiff to watch her feet during the test, although the written instructions on the FST Form indicate that he should have done so. *Id.*; 38-10 at 2. He also does not fully verbalize the instructions for the turn. Coban at 12:52:05–12:52:47; 38-10 at 2.

During the first half of the walk and turn, Plaintiff appears to step on the back of her sandal. *Id.* at 12:53:05–:10. She stumbles briefly, then continues with the test. *Id.* After she incorrectly executes the turn, she asks Deputy Mowatt if she did it right. *Id.* at 12:53:10–:17. During the second half of the test, Deputy Mowatt flashes his light every time he alleges Plaintiff stepped off the line. *Id.* at 12:53:18–12:53:38. But the video footage doesn't show Plaintiff stepping in the wrong place. *Id.* Instead, it looks as if she stayed on the line. *Id.* Plaintiff was not looking down at her feet, because she had not been properly instructed to do so. *Id.*

During the one leg stand, Plaintiff does not appear to be "swaying" or off balance. *Id.* at 12:55:10–:44. While performing the finger to nose test, she leaves her finger on her nose for several seconds the first two times (the test instructions do not include the precise amount of time the subject should leave her finger on her

nose). *Id.* at 12:56:18–12:57:24; Dkt. 38-10 at 2. The video is not close enough to show whether Plaintiff touched the tip of her nose, but it also does not contradict her assertion that she did so. Coban at 12:57:01–:53.

For the entire 25-minute-long video, Plaintiff appears composed. She is polite and cooperative. She does not stumble or slur her speech. In short, she appears in full control of her faculties and does not look impaired.

## II. Procedural History

In February 2019, after the State Attorney declined to prosecute her DUI charge, Plaintiff petitioned the Pinellas County Court to expunge her arrest record under Fla. Stat. § 943.0585. Dkt. 20 at 12–13; Dkt. 47-2. The county court issued an expungement order in October 2019, and the records related to Plaintiff's arrest and detention were destroyed pursuant to the court's order. Dkt. 20 at 13. Plaintiff later filed the instant Complaint, stating claims of false arrest and false imprisonment against the Pinellas County Sheriff in his official capacity and Deputy Mowatt under § 1983. Dkt. 1-1. She seeks compensatory relief and fees and costs. Dkt. 1-1 at 6.

Defendants removed the case to federal court and filed a Motion to Dismiss for failure to state a claim and on the basis of Deputy Mowatt's qualified immunity. Dkt. 9. The Court denied the Motion, finding that the Complaint stated a claim and viably alleged an absence of arguable probable cause concerning

Plaintiff's arrest and continued detainment. Dkt. 16 at 10. Defendants filed an Answer and Counterclaim for spoliation of evidence, based on Plaintiff's expungement of her arrest records. Dkt. 20.

Defendants now bring the instant Motion for Summary Judgment. They ask the Court to enter final summary judgment in their favor on all Plaintiff's claims, arguing that: (1) Deputy Mowatt is shielded by qualified immunity; (2) the initial encounter was consensual and the roadside investigation based on reasonable suspicion; (3) Deputy Mowatt had probable cause to arrest Plaintiff based on his DUI investigation; (4) probable cause did not dissipate with the 0.00% BAC result; and (5) Plaintiff seeks unrecoverable damages. Dkt. 38. Plaintiff filed her own Motion for Summary Judgment, asking the Court to rule that Defendants' counterclaims for negligent and intentional spoliation do not exist as separate causes of action under Florida law. Dkt. 39 at 11.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

The Court will discuss Defendants' Motion for Summary Judgment before turning to consider Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim.

## I.     Defendants' Motion for Summary Judgment

Defendants ask the Court to rule in their favor on all of Plaintiff's claims based on the following reasoning: (1) Deputy Mowatt is protected by qualified immunity; (2) the initial encounter was consensual and the roadside investigation based on reasonable suspicion; (3) Deputy Mowatt had probable cause to arrest Plaintiff based on his DUI investigation; (4) probable cause did not dissipate with the 0.00% BAC result; and (5) Florida law prohibits an award to attorney's fees for false arrest and false imprisonment claims. Dkt. 38. The Court addresses each argument below.

### A. Consent and Reasonable Suspicion

Based on the undisputed facts, the Court finds that Plaintiff's initial encounter with Deputy Mowatt was consensual, and that the roadside investigation was based on reasonable suspicion.

An encounter with law enforcement is consensual when "a reasonable person would feel free to terminate the encounter." *United States v. Ramirez*, 476 F.3d 1231, 1238 (11th Cir. 2007) (quoting *United States v. Drayton*, 536 U.S. 194,

201 (2002)). Roadside stops are generally considered consensual if the officer is not threatening, "the tone of the exchange [is] cooperative," and the citizen has "everything he need[s] to lawfully proceed on his journey." *Id.* (quoting *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996)). Plaintiff voluntarily drove to the investigation site, parked her car, and got out. Dkt. 38-3 at 18. Upon seeing Deputy Mowatt, a uniformed law enforcement officer, Plaintiff did not proceed on her journey, but instead approached him. *Id.* at 19. Deputy Mowatt was non-threatening, and the tone of the encounter was cooperative.

Further, Deputy Mowatt had reasonable suspicion to detain Plaintiff for further investigation. Reasonable suspicion is "a particularized and objective basis for suspecting legal wrongdoing." *Miller v. Harget*, 458 F.3d 1251, 1259 (11th Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). When Deputy Mowatt determined that a DUI investigation was necessary, Plaintiff had admitted to consuming alcohol, and her eyes were allegedly bloodshot and glassy. Dkt. 38-3 at 12, 25. These uncontested facts form a sufficient basis for Deputy Mowatt to suspect Plaintiff had been driving while impaired.

B. Qualified Immunity and Probable Cause

Plaintiff asserts that, even if Deputy Mowatt had reasonable suspicion, his investigation did not yield probable cause for arrest. She brings a § 1983 claim against him for violation of her Fourth and Fourteenth Amendment rights.

14

Defendants move for summary judgment on this claim, arguing that Deputy Mowatt is shielded from suit by qualified immunity, that he had probable cause to arrest Plaintiff after the roadside investigation, and that probable cause did not dissipate after Plaintiff's 0.00% BAC test result. The Court will address these related issues together.

    i.   Legal Standard

The doctrine of qualified immunity protects agents of the government "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To receive qualified immunity, an official must first "establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts occurred." *Robinson v. Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citations and internal quotations omitted). Once this showing is made, the burden shifts to the plaintiff to "show that (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* at 1340–41 (quotation omitted). The plaintiff must establish both prongs to defeat qualified immunity; however, courts may address them in either order. *Pearson*, 555 U.S. at 242. "Qualified immunity 'gives ample room for mistaken judgments' but does not protect 'the plainly incompetent or

those who knowingly violate the law.'" *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)), *abrogated on other grounds by Washington v. Howard*, 25 F.4th 891 (11th Cir. 2022).

On summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving party]." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Id.* In any case, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record (as with a video recording of the incident), so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Robinson*, 46 F.4th at 1340 (quotation omitted). Ultimately, "if the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial." *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015).

ii.   <u>Analysis</u>

In the instant case, the parties do not contest that Deputy Mowatt was functioning within the scope of his discretionary authority. To defeat summary

judgment, Plaintiff must establish that a reasonable jury could find Deputy Mowatt violated her constitutional right, and that her right was clearly established when Deputy Mowatt violated it. *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024).

"A warrantless arrest without probable cause" violates the arrestee's Fourth Amendment right. *Baxter v. Roberts*, 54 F.4th 1241, 1266 (11th Cir. 2022) (quotation omitted). That Fourth Amendment right is considered well established if the arrest was made without "arguable probable cause." *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023). "Probable cause exists if the totality of the circumstances known to the officers could persuade a reasonable officer that there is a 'substantial chance of criminal activity' by the person who is arrested." *Davis v. City of Apopka*, 78 F.4th 1326, 1334 (11th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). Arguable probable cause exists where "a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests." *Garcia*, 75 F.4th at 1186 (quoting *Wesby*, 583 U.S. at 68).

### a. Actual Probable Cause for Roadside Investigation

Under Florida law, a person is considered "under the influence" if her blood-alcohol or breath-alcohol level is over 0.08, or if she is affected by alcohol or drugs "to the extent that [her] normal faculties are impaired." Fla. Stat. § 316.193. In

Florida, under the influence "means something more than having simply consumed an alcoholic beverage." *State v. Catt*, 839 So. 2d 757, 760 (Fla. 2d DCA 2003) (citing *State v. Brown*, 725 So. 2d 441, 444 (Fla. 5th DCA 1999)).[3] As a result, "[p]robable cause for a DUI arrest must be based upon more than a belief that a driver has consumed alcohol; it must arise from facts and circumstances that show a probability that a driver is impaired by alcohol[.]" *State v. Kliphouse*, 771 So. 2d 16, 22 (Fla. 4th DCA 2000); *see also Davis v. Williams*, 451 F.3d 759, 765 (11th Cir. 2006) (relying on Florida intermediate appellate court caselaw to determine what constitutes probable cause for arrest under Florida law).

Whether a driver's normal faculties are probably impaired is a "judgment call" based on objective "facts, circumstances, and information" that would lead a person of "reasonable caution" to so believe. *Brown*, 725 So. 2d at 444. "Components central to developing probable cause" include the odor of alcohol, "the defendant's reckless or dangerous operation of a vehicle, slurred speech, lack of balance or dexterity, flushed face, bloodshot eyes, admissions, and poor performance on field sobriety tests." *Kliphouse*, 771 So. 2d at 23. At the same time, incorrectly administered FSTs are not reliable indicators of impairment. *Strickland v. City of Dothan*, 399 F. Supp. 2d 1275, 1289 (M.D. Ala. 2005).

---

[3] *Catt* and *Brown* discuss § 316.1933 of the Florida Statutes, and *Kliphouse* discusses § 316.1932. However, each court expressly defines "under the influence" in those sections with reference to § 316.193, the section at issue in the instant case. *Catt*, 839 So. 2d at 759; *Kliphouse*, 771 So. 2d at 22; *Brown*, 725 So. 2d at 444.

Ultimately, probable cause is based on the totality of the circumstances. *Kingsland*, 382 F.3d at 1230. As a result, courts should not take a "divide-and-conquer" approach that views each the *Kliphouse* component in isolation. *U.S. v. Arvizu*, 534 U.S. 266, 274 (2002); *see also Streeter v. Dep't of Pub. Safety*, --- F. Supp. 3d ---, 2023 WL 5532186, at *8 (S.D. Ga. Aug. 28, 2023) (relying on *Arvizu* to assess probable cause for a DUI arrest). And to consider the totality of the circumstances, courts must view seemingly exculpatory facts alongside those that appear incriminating. *Kingsland*, 382 F.3d at 1228. Video evidence can illuminate the facts, circumstances, and information upon which the arresting officer based his decision. *See Crystal Poole v. Gee*, No. 8:07-CV-912-EAJ, 2008 WL 3367548, at *2 (M.D. Fla. Aug. 8, 2008); *Robinson*, 46 F.4th at 1340.

In the instant case, it is undisputed that Plaintiff drove safely, spoke clearly, and was not flushed. She denies that her breath smelled of alcohol. The video evidence shows that her balance and dexterity were normal, that she was overweight and had an injury affecting her balance, and that Deputy Mowatt gave incomplete walk and turn instructions. Plaintiff also states that she touched her nose on the finger to nose test and denies using her arms for balance on the walk and turn—assertions the video evidence does not contradict. Defendants would have the Court find probable cause in Plaintiff's admission to drinking, the appearance of her eyes, and her errors on the FSTs. But doing so would constitute

just the sort of "divide-and-conquer" approach that is antithetical to a totality of the circumstances analysis, all the while ignoring the video evidence.

Deputy Mowatt's story is not blatantly contradicted by the Coban footage, but it is undermined. For example, the video evidence appears to show that Plaintiff did not step off the line during the second half of the walk and turn. Defendants contend that Deputy Mowatt's superior line of sight allowed him to see her step off. Dkt. 54 at 5. But a reasonable jury, watching the Coban footage, certainly could find that Plaintiff stayed on the line. In the same way, Deputy Mowatt alleges that Plaintiff was "swaying" at multiple points during the investigation, but the video evidence does not show as much. While he argues that Plaintiff's side-to-side movement was more pronounced than it appears in the video, Dkt. 54 at 4–5 n.6, a jury could find he erred by relying on that indicator. Similarly, Deputy Mowatt marked "loses balance" when Plaintiff moved her foot during the walk and turn instructions. A jury might find that marking a decision clue when Plaintiff appears to be reacting to a balance-affecting injury shows a failure to consider the totality of the circumstances, as a person of reasonable caution must. Looking at the video as a whole, a jury could reasonably conclude that Plaintiff's faculties were unimpaired. Indeed that is what appears to the undersigned's untrained eye after multiple reviews of the video.

*b. Actual Probable Cause for Continued Detention*

Even if the Court had found that Deputy Mowatt had probable cause for the roadside arrest, probable cause for Plaintiff's continued detention after her 0.00% BAC result is a separate issue that must be analyzed on its own. A finding that a warrantless arrest was supported by probable cause "is not the end of the matter, for detention in jail is a type of seizure of the person to which Fourth Amendment protections attach." *Barnett v. MacArthur*, 956 F.3d 1291, 1297 (11th Cir. 2020). Probable cause "may also dissipate after an officer makes a warrantless arrest" based on additional information that comes to light. *Id.* Specifically, breathalyzer test results showing a 0.00% BAC may dissipate probable cause. *Id.* at 1295 (noting that two breathalyzer results of 0.00% BAC "established that [the plaintiff] was not intoxicated by alcohol").

It is undisputed that when Plaintiff was at the CBT facility, her breath alcohol level was 0.00%. An individual arrested for a DUI in Florida may not be released from custody unless: (1) her normal faculties are no longer impaired by drugs or alcohol; (2) her BAC is less than 0.05%; or (3) eight hours have elapsed from her arrest. Fla. Stat. § 316.193(9). However, if probable cause dissipates, officers may not continue to detain an individual merely because eight hours have not yet elapsed. *Barnett*, 956 F.3d at 1298. Plaintiff's BAC was 0.00% before she was booked into the jail. Dkt. 38-3 at 34–35. Thus, in order to have probable cause

for Plaintiff's continued detention, the totality of the circumstances known to Deputy Mowatt must have been such that a reasonable officer could believe there was a substantial chance Plaintiff was impaired by drugs.

This is exactly what Defendants contend. They argue that Plaintiff's signs of impairment from the HGN and her "poor performance on the FSTs" indicated drug impairment. Dkt. 38 at 15–16. But even if Deputy Mowatt had probable cause for the roadside arrest, probable cause to continue Plaintiff's detention would have dissipated when she twice blew 0.00% BAC. This is because the vast majority of indicators Deputy Mowatt alleges provided probable cause for the roadside arrest relate exclusively to alcohol use. There was virtually no evidence that Plaintiff was impaired by drugs.

Deputy Mowatt's purported basis for suspecting Plaintiff of a DUI was impairment by alcohol: her admission to drinking, her bloodshot and glassy eyes, and her allegedly poor performance on the HGN.[4] Deputy Mowatt further contends (though the Court does not accept this disputed fact as true) that Plaintiff's breath smelled of alcohol. Of all of these indicators, only one—bloodshot and glassy eyes—could indicate drug use. *See Strickland*, 399 F. Supp. 2d at 1283 (noting that an HGN tests only for alcohol impairment); *Barnett v. MacArthur*, 715 F. App'x 894, 907 (11th Cir. 2017) (describing the Vertical Nystagmus Test as "the only

---

[4] At oral argument, Deputy Mowatt's counsel noted that HGN "is not always 100%."

22

field sobriety test used to detect drugs"). Other indicators of drug use include slurred speech, the odor of marijuana, or evidence of drugs or drug paraphernalia in a suspect's vehicle, on her person, or within her personal effects. *Barnett*, 956 F.3d at 1295. Plaintiff exhibited none of these signs. Deputy Mowatt did not contend that Plaintiff appeared impaired at the CBT facility. *See* Dkt. 38-2 at 19. Plaintiff stated (and the record is uncontested) that a Sergeant at the Pinellas County jail informed her she seemed sober but had to remain in detention for eight hours anyway. Dkt. 38-3 at 37.

A reasonable officer, aware of these facts and circumstances, would not find a substantial chance that Plaintiff was impaired by drugs at the CBT facility.

### c. Arguable Probable Cause for Roadside Arrest

Having determined that Deputy Mowatt lacked actual probable cause for Plaintiff's roadside arrest and her continued detention at the Pinellas County jail, the Court turns now to the question of arguable probable cause. "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009). An officer lacks arguable probable cause, and thus is "on notice" that his conduct is unlawful, in three broad circumstances: (1) "existing precedent establishes that there was no actual probable cause" in factually analogous circumstances; (2) "the

23

text of an applicable statute plainly precludes" an arrest under the statute; or (3) the officer is "so lacking in evidence to support probable cause that the arrest was obviously unconstitutional." *Garcia*, 75 F.4th at 1186–87. "Unless the law makes it obvious that the officer's acts violated the plaintiff's rights, the officer has qualified immunity." *Id.* 1186 (quotation omitted).

A court denying qualified immunity based on existing precedent must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017). In making this determination, courts may draw from decisions of the U.S. Supreme Court, the Eleventh Circuit, and "the highest court of the pertinent state." *Marsh v. Butler Cnty*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (Tjoflat, J., concurring in part). But where an officer's conduct is obviously unconstitutional, a particularized prior case is not necessary. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

Plaintiff did not submit, nor could the Court find, caselaw from the U.S. Supreme Court, Eleventh Circuit, or Florida Supreme Court establishing that there was no actual probable cause for a factually similar circumstance. As a result, the Court can only deny Deputy Mowatt qualified immunity if his roadside arrest of Plaintiff was so lacking in evidence as to be obviously unconstitutional. The Court concludes that it was.

The Eleventh Circuit held as much when it affirmed a district court's denial of qualified immunity in an unpublished decision, *Barnett v. MacArthur*, 715 F. App'x 894 (11th Cir. 2017). An unpublished opinion cannot serve as existing precedent putting Deputy Mowatt on notice that his conduct was unconstitutional. But in *Barnett*, both the district court and the unpublished Eleventh Circuit opinion found a factually similar arrest to be obviously unconstitutional.

In that case, the plaintiff (Ms. Barnett) was driving home after an evening out in Orlando, during which she had consumed one to two drinks. *Barnett*, 715 F. App'x at 897; *Barnett v. MacArthur*, No: 6:15–cv–469–Orl–18DCI, 2016 WL 10654460, at *1 (M.D. Fla. Nov. 16, 2016). She fumbled when attempting to get her registration and insurance out of the glovebox. *Barnett*, 715 F. App'x at 897. Ms. Barnett had a leg injury, for which the arresting officer did not account when scoring the FSTs. *Id.* The parties disputed numerous issues of fact, such as whether Ms. Barnett drove erratically, how she performed on the FSTs, if her eyes were bloodshot and glassy, and whether the officer administered the FSTs properly. *Id.* Ms. Barnett was arrested and blew a 0.00% BAC at the jail. *Id.* She brought multiple claims against the arresting officer, including for false arrest and false imprisonment. *Id.*

The district court denied qualified immunity at the summary judgment phase, and the Eleventh Circuit affirmed. Remarking on the facts, the affirmance

noted that while there was some limited evidence of impairment, there was also evidence indicating lack of impairment, and there were numerous facts in genuine dispute. *Id.* at 906. On such a record, the Eleventh Circuit affirmed the district court's denial of qualified immunity on summary judgment. *Id.*

The facts here, taking Plaintiff's version as true, are similar. Like the officer in *Barnett*, Deputy Mowatt had a few indicators of potential impairment: mixed results on the HGN, allegedly bloodshot and watery eyes, and Plaintiff's admission to consuming several drinks over the course of about six hours. But admission to drinking does not, on its own, create probable cause for a DUI arrest in Florida, *Kliphouse*, 771 So. 2d at 22, and Deputy Mowatt was not free to ignore Plaintiff's weight or the offered information that she had been wearing contacts for almost 15 hours. *See Kingsland*, 382 F.3d at 1228–1230.

Additionally, just as in *Barnett*, there is question as to whether Deputy Mowatt properly administered the FSTs. The video evidence uncontrovertibly shows he failed to properly instruct Plaintiff and seems to disparage his assessment of Plaintiff's performance. His impeachable competency throws the HGN results into some question. Genuine disputes of fact such as this make summary judgment on qualified immunity improper. *See Johnson*, 280 F.3d at 1317.

Further, Deputy Mowatt failed to consider exculpatory information of which he was aware. While officers are not required to investigate every possibility of

innocence, they also cannot disregard information known to them. *See Kingsland*, 382 F.3d at 1228–1230. A reasonable officer considers all circumstances, rather than preferentially relying on facts that allude to criminal conduct. *Id.* Plaintiff, a heavyset woman, drank two to three ciders evenly spaced over 6.5 hours and interspersed with a meal, snacks, and water. Her last drink was at 11 P.M., she poured most of it out, and she waited an hour prior to driving. She drove safely, spoke clearly, was steady on her feet, and was not flushed. She had a knee injury and bodyweight that impacted her balance, but she still performed well on the FSTs that were properly instructed.

No reasonable officer, in the same circumstances and with the same knowledge as Deputy Mowatt, could believe Plaintiff to be impaired. As a result, there was no arguable probable cause for the roadside arrest.

### d.  Arguable Probable Cause for Continued Detention

In 2020 (several years after the events at issue here), the Eleventh Circuit held that when "officers seek and obtain information [such as a 0.00% BAC result] which shows beyond a reasonable doubt that the arrestee is not intoxicated—in other words, that probable cause to detain no longer exists—the Fourth Amendment requires that the arrestee be released." *Barnett*, 956 F.3d at 1299. *Barnett*, had it been decided earlier, would have been particularized prior precedent putting Deputy Mowatt on notice that Plaintiff's continued detention was

unconstitutional. *Barnett* cited *Alcocer v. Mills* for the more general proposition that, once probable cause has dissipated, continued detention of an arrestee violates the Fourth Amendment. *Alcocer v. Mills*, 906 F.3d 944, 954 (11th Cir. 2018). The question is whether the facts before the Court comprise an "obvious case" where the violated right is clearly established, even in the absence of factually analogous caselaw.

The Court concludes that Plaintiff's continued detention after her 0.00% BAC result was obviously unconstitutional. Once it became clear that Plaintiff was not under the influence of alcohol, the only justification to detain her was impairment by drugs. But, as the Court explained in its probable cause analysis, Plaintiff showed virtually no indicators of drug use. While Deputy Mowatt was not required to accept Plaintiff's innocent explanation for her eyes' alleged appearance, he was also not free to ignore the information that she'd been wearing contacts for fifteen hours. *Kingsland*, 382 F.3d at 1229; Dkt. 38-3 at 25. This statement of Plaintiff is not contested. Even without a directly on-point case, a reasonable officer would not think it constitutional to detain an individual purely because her eyes are red and watery, particularly late at night and with the knowledge that she's been wearing contacts all day.

The Court finds that, if Plaintiff's version of the facts is true, Deputy Mowatt lacked actual probable cause and arguable probable cause for Plaintiff's roadside

arrest and continued detention. Because a reasonable jury could find for Plaintiff on matters that would affect the outcome of the case, the Court denies summary judgment on Count III.

## C. Defendant Gualtieri's Liability

Counts I and II allege state law claims of false arrest and false imprisonment, "actionable against Defendant Bob Gualtieri in his official capacity pursuant to Florida Statute § 768.28." Dkt. 1-1 ¶¶ 28–36. Section 768.28 of the Florida Statutes provides that officers of the state (such as Deputy Mowatt) are immune from personal liability for torts committed within the scope of their employment.[5] Fla. Stat. § 768.28(9)(a). However, Florida plaintiffs may sue the governmental entity that employs the tortfeasor. *Id.*

Under Florida law, false arrest and false imprisonment are generally "different labels for the same cause of action." *Smart v. City of Miami*, 107 F. Supp. 3d 1271, 1279 (S.D. Fla. 2015) (internal quotes omitted). However, courts have treated the two claims separately in some circumstances. *See id.* at 1280 (false arrest and false imprisonment claims were not identical where plaintiff was lawfully arrested but unlawfully imprisoned); see also *Mathis v. Coats*, 24 So. 3d 1284, 1289 (Fla. 2d DCA 2010) (explaining that "false arrest is only one of several

---

[5] An exception to this rule, not alleged here, is that officers are personally liable if acting "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).

methods of committing false imprisonment"). Probable cause is an absolute bar to both false arrest and false imprisonment claims. *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998).

Taking Plaintiff's version of the facts as true, Deputy Mowatt lacked probable cause for both the roadside arrest and Plaintiff's imprisonment in the Pinellas County jail. *See supra*. As it is uncontested that Deputy Mowatt's actions were within the scope of his employment, Defendant Gualtieri may be held liable in his official capacity. The Court therefore denies Defendants' Motion for Summary Judgment on Counts I and II.

D. Plaintiff's Request for Fees

Defendants also request summary judgment on Plaintiff's claim for "out-of-pocket expenditures relating to her arrest and legal defense." Dkt. 38 at 21 (citing Dkt. 1-1 ¶ 27). They assert that legal fees for post-release representation and expungement are not recoverable in a false arrest case. *Id.* at 21–22. Plaintiff does not address the fees question in her Response. *See generally* Dkt. 48.

Under Florida law, a plaintiff pressing a false arrest claim may recover "reasonable and necessary expense incurred as a result of the unlawful imprisonment, including attorney's fees for services in procuring his discharge." *City of Miami Beach v. Bretagna*, 190 So. 2d 364, 365 (Fla. 3d DCA 1966). However, "fees for defending the plaintiff against the prosecution of the charge"

are not recoverable unless they are "necessary to secure the plaintiff's discharge from the illegal restraint." *Id.*

Because the Complaint does not describe Plaintiff's alleged losses with specificity, the Court cannot determine if they are of the type discussed in *Bretagna*. Dkt. 1-1 ¶¶ 27, 40–43. The Court denies summary judgment on this point and carries all issues relating to damages with the case.

## II.    Plaintiff's Summary Judgment Motion on Defendants' Counterclaim

Defendants allege that Plaintiff planned to sue them before she requested her arrest record be expunged and that the expungement destroyed relevant information. Dkt. 47 at 3, 6. They argue that "the combination of [Plaintiff's] knowledge that she was going to sue and the timing of the expungement" creates a cause of action for spoliation under Florida law. Dkt. 47 at 10. Accordingly, they bring a two-count counterclaim for negligent and intentional spoliation of evidence. Dkt. 20 at 18–20.

There is no independent cause of action for first-party spoliation of evidence in Florida. *Martino v. Wal-Mart Stores, Inc.*, 908 So. 2d 342, 346-47 (Fla. 2005). In *Martino v. Wal-Mart Stores*, the Florida Supreme Court considered "whether an independent cause of action should exist for first-party spoliation of evidence" and concluded that it should not. 908 So. 2d at 346–347. The *Martino* court held that,

31

under Florida law, presumptions and sanctions are the appropriate remedy for first-party spoliation. *Id.* at 347.

In a footnote, *Martino* defined first-party spoliation claims as "claims in which *the defendant* who allegedly lost, misplaced, or destroyed the evidence was also a tortfeasor in causing the plaintiff's injuries or damages." *Id.* at 346 n.2 (emphasis added). Relying on this language, Defendants argue that *Martino* prohibits independent spoliation claims against defendants, but not plaintiffs. Dkt. 47 at 17. They cite several federal district court cases in support. *Id.* While it is true that the cited cases discuss claims against defendants, it is also true that in each case it was the plaintiff who pressed the first-party spoliation claim. *Martino*, 908 So. 2d at 344; *Debose v. Univ. of S. Fla.*, 178 F. Supp. 3d 1258, 1264 (M.D. Fla. 2016); *Scott v. Hess Retail Ops., LLC*, No. 8:14-cv-1437-T-24-TBM, 2015 WL 4602605, at *3 (M.D. Fla. July 29, 2015).

*Martino* implies that, under Florida law, the rationale for allowing or disallowing independent spoliation claims is a question of available remedy. The *Martino* court concluded that sanctions and presumptions are an adequate remedy against a first-party defendant for spoliation of evidence. *Martino*, 908 So. 2d at 347; *see also Amerisure Ins. Co. v. Rodriguez* 255 So. 3d 502, 504 (Fla. 3d DCA 2018) (paraphrasing *Martino*). Defendants have not suggested—and the Court cannot conceive of—any reason that this rule would not apply equally to plaintiffs.

Indeed, the Florida Rules of Civil Procedure already provide that, like defendants, plaintiffs can be subject to presumptions and sanctions for intentionally failing to preserve electronically stored information. Fla. R. Civ. P. 1.380(e). When a party to litigation spoliates evidence, there are remedies available to right the wrong. But when a non-party destroys evidence, the victim's only recourse is to file suit.

Naturally, the Court would be more comfortable citing Florida appellate caselaw that conclusively addresses Defendants' argument. But the Court could not find, nor did the parties cite, such a case. The federal decision on which Defendants most rely, *Centex Homes v. Mr. Stucco, Inc.*, reinforces the Court's view of this issue. The *Centex* court permitted an independent cause of action because the plaintiff's spoliation impaired the defendant's ability to bring potential suits against third parties. *Centex Homes v. Mr. Stucco, Inc.*, No. 8:07–CV–365–T–27MSS, 2008 WL 11336645, at *2 (M.D. Fla. Mar. 25, 2008). *Centex* cites *Kimball v. Publix Super Markets, Inc.* In *Kimball*, the court recognized a first-party cause of action against the *defendant*, whose spoliation prevented the plaintiff from bringing a claim against a non-party. 901 So. 2d 293, 296 (Fla. 2nd DCA 2005). Cases like *Centex* and *Kimball*, in which sanctions or presumptions would not remedy the underlying harm, appear to be the rule-proving exceptions.

In this case, should the Court find that Plaintiff spoliated evidence by availing herself of Florida's expungement statute, it can address any subsequent

harm. However, the Court makes no such finding in this Order. Plaintiffs' Motion for Summary Judgment on Defendants' Counterclaims (Dkt. 39) is granted.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (Dkt. 38) is **DENIED** and Plaintiff's Motion for Summary Judgment on Defendants' Counterclaim (Dkt. 39) is **GRANTED**. For Defendants' Counterclaim, the Clerk is directed to enter judgment in favor of Plaintiff and against Defendants.

**DONE AND ORDERED** at Tampa, Florida, on March 18, 2024.


*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record